**Samie Lee MILLER, Jr., Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 90–239.

Supreme Court of Wyoming.

April 20, 1992.

**420**

Leonard D. Munker, State Public Defender, Gerald M. Gallivan, Director, Wyoming Defender Aid Program, and Thomas W. Harrington, Student Intern, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Hackl, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., and Dennis C. Cook, Sr. Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

URBIGKIT, Chief Justice.

Appellant, Samie Lee Miller, Jr. (Miller), appeals from a first degree sexual assault [1] conviction contending that the trial court erred in allowing the introduction of certain evidence; the prosecutor committed misconduct in closing comments; as defendant, he was denied effective assistance of counsel; and cumulative trial error occurred further requiring reversal.

We affirm.

## I. ISSUES

Miller asks in his appeal:

I.   Did the trial court err by allowing the State to introduce prior bad acts under Rule 404(b) for the purpose of attacking appellant's credibility?

II.   Did a witness's testimony that defendant could have requested a DNA test, and the prosecution's closing argument on that testimony, shift the burden of proof to appellant in violation of United States and Wyoming Constitutions?

III.   Was it plain error to allow the prosecutor to discuss mathematical probabilities in his closing argument?

IV.   Did the court err in failing to give a limiting instruction that the fabricated

---

**1.** Wyo.Stat. § 6-2-302 (1988) states in part: Sexual assault in the first degree.

   (a) Any actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if:

   (i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement[.]

alibi could only be used as consciousness of guilt [and] not evidence of guilt?

V. Was appellant denied effective assistance of counsel guaranteed by the United States and Wyoming Constitutions?

VI. Should appellant's conviction be reversed pursuant to the doctrine of cumulative error?

The State rephrases the issues as:

I. Whether the decision to allow the introduction of appellant's prior sexual assault conviction for limited purpose of attacking his credibility was proper?

II. Whether the admission of statements initially elicited by appellant about appellant's ability to obtain a DNA test improperly shifted the burden of proof?

III. Whether the prosecutor's comments about appellant's evidence in closing argument can support reversal as plain error?

IV. Whether [the] jury could consider appellant's attempts to fabricate evidence?

V. Whether appellant was denied effective assistance of counsel?

VI. Whether appellant's conviction should be reversed under the cumulative error doctrine?

## II. FACTS

Except for identification of the rape victim's assailant, the essential facts in this case are not in material dispute. As defense counsel stated in his opening remarks at trial, "there is no doubt * * * that [the victim] was sexually assaulted. * * * The only issue in this particular case is who did it."

Following several hours of drinking and bar hopping, the victim encountered Miller and his female date at a Laramie, Wyoming, nightclub shortly after midnight on January 13, 1990. Prior to their nightclub meeting, the victim, a young white female, did not know the appellant, a young black male. The victim walked up to Miller and

asked if he was "a good kisser" and whether she could kiss him. His female friend became upset with the victim's flirting and, after a brief argument with Miller, left the bar. A short time later, the victim in anticipated goodwill went outside to find the girlfriend in order to talk about what had happened.

It is at this point that the victim's recollection and Miller's reconstruction of the night's events differ. Stating one perspective, Miller claimed that he did not leave the bar until sometime later at which time he walked home alone, and, alternatively, that he and his female friend stayed at the bar until closing at which time she gave him a ride home.[2] Directly to the contrary, the victim testified that Miller followed her out of the bar to assist in finding his girlfriend. The victim claimed that after walking a short distance from the bar, Miller grabbed her arm and dragged her more than two blocks to an alcove behind a local restaurant. She testified that once in the alcove, Miller began beating her on the head with a rock until she fell to the ground where she was raped. Penetration occurred, Miller ejaculated on her thigh, and shortly thereafter left the scene.

The victim made her way to another nearby bar where bystanders aided in securing temporary medical and police assistance. After making a statement to the police which included a description of the events preceding the rape and a description of her assailant, the victim was transported by ambulance to the hospital where she received treatment for multiple head lacerations, was screened as a rape victim and was tested for blood alcohol content.

The police searched the rape scene where they found a bloodstained rock, a large amount of blood and a shoe heel print. The blood matched the victim's blood type and the shoe print was later determined to match a similar pair of shoes owned by Miller and confiscated in a subsequent vol-

2. Miller testified at trial that he walked home alone from the bar. Miller also admitted to fabricating an alibi in which he alleged prior to

trial that he was given a ride home by his female friend after the bar closed.

untary search of his residence.[3] During the investigation, the victim selected Miller as her assailant in a police photograph line-up, then identified him at a district court motion hearing and, ultimately, provided a positive identification during the trial. Her identification was clear and unequivocal.

Three days after the occurrence, Miller, his female friend and Miller's brother voluntarily went to the Laramie police station because they anticipated that Miller might be a suspect in the rape (actually, by this time, two rapes—see n. 5 *infra*). While on their way to the police station, Miller and his female friend concocted a fabricated alibi for Miller's actions during the early morning hours of January 13. Essentially, the alibi consisted of the female friend claiming she gave Miller a ride home from the bar after it closed on January 13. After giving a statement to that effect to the police on January 16, the female friend recanted her statement the following day. Miller later testified that he fabricated the alibi since he was afraid of problems resulting from a prior sexual assault conviction and because he was a black man and the rape victim was white.[4]

The police secured a statement from Miller under a full *Miranda* waiver and arrested him for the alleged rape. In conjunction with that arrest, Miller voluntarily consented to a search of his residence. The police confiscated three pairs of pants, several pairs of underwear, a shirt and a pair of shoes which were subsequently found to resemble the heel print left at the rape scene. The crime laboratory examined the seized clothing for blood but found no incriminatory evidence. The accused

also consented to have his blood type tested. Both he and the victim were found to have A-type blood—the same blood type identified in the spermatozoa taken from the victim's thigh. Neither the prosecution nor the defense requested DNA testing.

Miller was appointed a public defender on January 17, 1990 and then waived a preliminary hearing. The district court information charging first degree sexual assault was filed to which Miller entered pleas of not guilty, not guilty by reason of mental deficiency, and not triable by reason of mental illness or deficiency.[5] Miller was examined pursuant to his plea of mental illness and deficiency at the Wyoming State Hospital and, by trial court order, was given a second examination by Dr. Brian Miracle, a clinical psychologist from Lander, Wyoming. The insanity pleas were not pursued at trial and the case was presented and submitted by specific instruction of the trial court on the theory of defense of misidentification resulting from victim "confusion." He was convicted by a jury of first degree sexual assault and received a confinement sentence of seventeen years to life. From that sentence, he now appeals.

## III. ANALYSIS

### A. Prior Bad Acts

This issue develops from the arrest-time interview and statement of Miller where, during the course of discussion, he commented:

> I, I think of myself as [an] alright looking guy, I guess, * * * I wouldn't have

---

3. Initially, Miller claimed that he had been wearing tennis shoes on the evening of the rape. Later, however, Miller changed his story to reflect that he was wearing the shoes confiscated by the police during their search.

4. Miller, age twenty-six, was a native of Laramie. In 1983, he had pled guilty to dual burglary charges in that city. In 1984, he had pled guilty to forcible rape in Cheyenne, Wyoming and subsequently received supervised probation with a suspended sentence of ten to twenty years. Miller's probation "was revoked" and he was sentenced to the state penitentiary, paroled and the term of parole actually ended before these events unfolded in 1990. Although not on

parole in 1990, he was obviously well-known to the Laramie police from various involvements, including a 1987 arrest and hospitalization in the Wyoming State Hospital.

5. Miller was initially charged with two counts of first degree sexual assault—the second count arising from a separate and unrelated incident on January 15, 1990 occurring two days after the date of this offense, which charge was subsequently dismissed. An identical three-part plea was also entered to the second charged offense at the same time of plea to the crime involved in this appeal.

to rape nobody. I always have a girl-friend you know, I beat a case like this in Cheyenne, this girl tried to accuse me of raping her.

Prior to trial, Miller's defense counsel requested the disclosure of "evidence of Defendant's prior acts of misconduct [proposed] for introduction under Rule 404(b) W.R.E." Defense counsel also filed a motion in limine "to prevent the State of Wyoming from introducing at trial a previous sexual assault conviction of the Defendant under 404(b) W.R.E." At a pretrial motion hearing, the trial court ruled that while the statement could not be admitted to show identity, it could be admitted to test Miller's credibility:

> [O]n the first motion before the court, the Motion in Limine to suppress or limit the prior sexual assault conviction under Rule 404(b), the court finds that the conviction should not be used for identity * * *. The court will, however, and the court finds that the statement that was given by the defendant apparently was given voluntarily, there has been no proceeding to suppress that statement, at least none cognizable by the court, the statement will come in in the state's case-in-chief, and that certainly the prior conviction goes to the credibility of that statement made by the defendant, so the prior conviction will come in in the case-in-chief on the issue of credibility, and the jury will be specifically instructed they may consider that instruction only as it relates to the defendant's statement that he had not previously been subjected to criminal liability for a similar act, however the statement reads in the transcript.

During jury voir dire, the first mention of Miller's prior second degree sexual assault guilty plea and conviction resulted from comment of his defense counsel[6] when the attorney asked whether any potential jurors were predisposed to convict Miller because of a previous conviction. At trial, the transcript of the voluntary statement Miller made to the police on January 16, 1990 was introduced and admitted with stipulated approval of defense counsel. At that time, defense counsel specifically noted that the statement was a completely voluntary statement, that it suffered no defects under *Miranda,* and observed that the statement was exculpatory in nature. It was only after this statement was admitted and available to the jury that the prosecution made reference to the prior sexual assault conviction to show that Miller had lied to the police in his statement. During cross-examination of the police detective, the prior conviction was again raised by defense counsel in an attempt to show that the detective did not have personal knowledge of whether there was an additional charge from which Miller had not been convicted, and thus show that Miller did not lie to the police in his statement when he said he "beat a case like this in Cheyenne." By this stage, the earlier Cheyenne rape conviction was well known by the jury.

Only later did the prosecution finally introduce documentary evidence of the prior conviction to show that Miller had not "beat" the charge in Cheyenne since he had not only been convicted, but then lied about that conviction during police interrogation. Defense counsel renewed his earlier W.R.E. 404(b) objection on the use of the prior conviction. Then, at a subsequent bench conference, defense counsel helped produce the limiting instruction that was given to accompany the admission of State's Exhibit 12:

> State's Exhibit 12 [Miller's judgment and sentence from his January 18, 1985 conviction for second degree sexual assault] is admitted but has limited admissibility, and is admitted for a purpose, and I will instruct the jury at this time that the evidence that has now been admitted as State's Exhibit 12 pertaining to a prior felony conviction of the defendant has been admitted for the limited purpose of

---

6. Defense counsel stated in voir dire examination:

[S]o what I am going to ask you is, knowing what you know about this case in total, the, and I am going to admit that my client has been convicted of a prior sexual assault * * *.

allowing the State of Wyoming to put forth evidence attacking the credibility of the defendant. I would instruct you that you must not consider the prior felony conviction as evidence that the defendant did in fact commit the crime charged here, merely because he may have been convicted previously of a felony.

I think that's clear, and I see the jury is understanding.

State's Exhibit 12 is admitted with this limitation that the jury has now heard.

No further references were made to the prior conviction until Miller took the stand and began his testimony by admitting that he had been previously convicted of second degree sexual assault. The prosecution raised the subject briefly again on cross-examination to show that his present trial admission contradicted his earlier statement to the police.

■ We address this prior conviction evidence to consider here whether the fact that Miller lied to the police about his prior sexual assault conviction was admissible testimony. The evidence is compelling that Miller did lie to the police several times during their investigation. We have held that "[t]he fabrication of false accounts by an accused criminal for the sake of diverting inquiry or casting off suspicion is a circumstance always indicative of guilt." *Bennett v. State*, 377 P.2d 634, 638 (Wyo. 1963). *See also Cowell v. State*, 719 P.2d 211 (Wyo.1986) and *Russell v. State*, 583 P.2d 690 (Wyo.1978). In this case, the first false account was a lie about a prior conviction for sexual assault—a prior bad act— actually constituting a volunteered misstatement during interrogation. We have held that the use of evidence involving collateral misconduct is permissible when the testimony relates to the course of conduct. *Scadden v. State*, 732 P.2d 1036 (Wyo. 1987); *Crozier v. State*, 723 P.2d 42 (Wyo. 1986). Miller's misstatements relative to his status and the events of that night were certainly a part of what occurred during the investigation, what he said and why it was not true.

In this appeal, Miller misunderstands the status of the prior rape conviction evidence as used at trial. Examination of the record reveals that defense counsel, the prosecutor and the trial court all recognized that the evidence was admissible in the context of what occurred during the investigation, and the limiting instruction that was given was appropriate. Usage of the conventional W.R.E. 404(b) evidence is not the issue presented. As clearly defined by the trial court in the limiting instruction, this evidence—like the contrived alibi testimony— came in as an issue of credibility to challenge the believability of appellant when he was careless with the facts in talking to the investigating police officers. Obviously, his lack of candor and outright lies provided suspicion of guilt for the investigating officers and weight for analysis by the jury regarding his further statement that he was not involved in the rape and, consequently, he had only been "misidentified."

The volunteered "macho" statement was admissible to challenge credibility when used at trial to compare what was said to what the facts really were. Credibility impeachment by trial evidence comparison of what was said with actual facts was appropriate. *Miller v. State*, 784 P.2d 209 (Wyo. 1989). This court had earlier followed the general rule that "[e]vidence of other offenses may be received for the purpose of impeaching the defendant's credibility." *Kwallek v. State*, 596 P.2d 1372, 1379 (Wyo.1979) (citing *Galbraith v. State*, 503 P.2d 1192 (Wyo.1972); *Valerio v. State*, 429 P.2d 317 (Wyo.1967); and *State v. Fleischman*, 10 Or.App. 22, 495 P.2d 277 (1972)).

Obviously, the scope of Miller's lack of demonstrable credibility was exacerbated since he had not "beat" the Cheyenne rape charge. Admissibility was appropriately recognized by the trial court in the pre-trial *Denno* hearing and confirmed as trial evidence regarding investigation and credibility when defined by the specific limiting instruction which was given. The challenged statement of Miller and its invalidity as a fact was properly admitted within the discretion of the trial court pursuant to W.R.E. 104(e) and the limitation proposed in accord with W.R.E. 105. Since Miller's

statement was admitted into evidence on stipulated approval, we find no trial court error in decision after the *Denno* hearing or thereafter during trial regarding the usage of this evidence to establish that the investigative statement had been untruthful. The circumstance of case development provided the basis for trial evidentiary introduction. *Crozier*, 723 P.2d 42.[7]

### B. DNA Testing

■ Miller contends that it was plain error to allow the forensic scientist to testify that Miller did not request DNA testing of a spermatozoa sample found on the victim's leg. Extensive review of the trial transcript reveals the first mention of DNA testing was during defense counsel's cross-examination of the forensic scientist. Defense counsel requested the forensic scientist to describe DNA typing. An extensive discussion was then presented about the reliability of and procedures for testing.[8] The defense then elicited from the forensic scientist the fact that she knew that the State had the burden of proving the defendant guilty. During redirect, the prosecution was allowed, without objection, to show that the defendant could have requested the DNA typing. The defense recross further brought home the fact that DNA testing was not done by alluding to cost.

During closing arguments, the first mention of DNA testing came from the defense:

But one of the big things they don't have is, they don't have DNA. [The prosecutor] kind of indicated on cross-examination, and he's going to hit this on his closing, on his rebuttal, he's going to say, "Well gosh, cost[s] us 1500 bucks to send that stuff in, and you don't know what your going to get." Don't know what you are going to get. "Takes a long time if you send it to the FBI lab, and [defense counsel] could have sent it in himself." I'll agree. I could have sent that in myself, but somebody has got the rules here messed up a little, because the judge has instructed you on Instruction 8 that [the prosecutor] has the burden of proving the defendant guilty. "The law does not require a defendant to prove his innocence or to produce any evidence whatsoever." Yet [the prosecutor] says, "Gosh, 1500 bucks." You know, I got access to all of these police agencies, DCI, sheriff's office, police department, FBI, crime lab, and I can't afford to send it in for 1500 bucks. Well, ladies and gentlemen, he tells my client, my client should sen[d] it in. My client cannot even afford to hire his own lawyer. If he has 1500 bucks, he's going to post bond out of jail. He ain't got 1500 bucks to be sending around for a DNA sample. Yet [the prosecutor] want[s] to place that burden on us, says, "Hey look, just because I didn't send it in for any DNA, it's okay."

In response, the prosecutor made the following statement during closing argument:

Now [defense counsel] suggested to you that DNA would solve your problem. Folks, it would just create a different problem. First of all, the DNA was not requested by me and it wasn't requested by [defense counsel]. And it does not have anything to do with cost. * * * I don't need DNA to prove this case beyond a reasonable doubt.

■ It is a well-established trial principle that since the prosecution has the burden of proof, *Stephens v. State*, 774 P.2d 60, 75 (Wyo.1989), it also has the discretion to determine what evidence should be presented at trial. *Gezzi v. State*, 800 P.2d

---

7. The segment of the statement or, for that matter, the entire statement and the conflicting fact of Miller's actual criminal status was not tendered by the State nor accepted by the trial court as W.R.E. 609 impeachment. Within the trial developments, the prior rape conviction, coming in as a volunteered false interrogation statement, was not classical W.R.E. 609 "convicted of a crime" impeachment of credibility evidence. *See Robinson v. State*, 716 P.2d 364 (Wyo.1986).

8. The volume of currently developing case law on DNA testing is astounding. In current consideration, see the Texas triple murder case of *Trimboli v. State*, 817 S.W.2d 785 (Tex.App. 1991). At least a score of other very recent cases can be similarly cited.

485, 486 (Wyo.1990). Likewise, the prosecution has no mandatory obligation to produce *all* witnesses conjecturally available to provide relevant testimony. *See Wilde v. State,* 706 P.2d 251, 255 (Wyo.1985). The prosecution has no defined duty to try the case for the defendant, and consequently it is not an assumed responsibility to provide the defendant's evidence. The *Brady* obligation stops with hiding and non-disclosure of evidence and does not extend to affirmative compilation and production. *Wilde,* 706 P.2d at 255.

We recently considered an analogous argument in *Van Duser v. State,* 796 P.2d 1322 (Wyo.1990). In *Van Duser,* the prosecution questioned the defendant's failure to perform certain scientific tests. We held that the prosecution's questioning did not shift the burden of proof. *Id.* at 1324. This is no different than where, as here, the defense questioned the prosecution's failure to perform certain scientific tests.

The first mention of DNA testing in this case was made by Miller's attorney during cross-examination. The prosecutor briefly continued the line of questioning during redirect. During closing, the first mention of DNA testing was again made by the defense. The prosecutor's subsequent closing comments were a proper response to the argument raised in defense counsel's closing and, in light of the other evidence presented against Miller, were not prejudicial to Miller and violated neither his rights guaranteed under the Wyoming Constitution nor the Constitution of the United States. *Herdt v. State,* 816 P.2d 1299 (Wyo.1991).

### C. Prosecutor's Closing Argument

█ Miller argues that the prosecutor misrepresented the testimony of a shoe salesman who testified about the type of shoe that left the heel print at the rape scene. Miller also argues that the prosecutor used mathematical probability as a major part of his closing argument.

The prosecutor stated during his closing:

Now, you heard from the man from the shoe store that they had about 30 pairs of those shoes in August of 1989,

that they still had a few pairs that were going to go on sale this week, or something like that. I didn't ask and I should have, if you order 30 pairs of shoes, what were the chances that [the shoe store] would order all size 11? Probably pretty slim, aren't they? And you heard [the police detective] say that the heel print differs in width and length as the size changes. So, we have got Mr. Miller wearing a pair of the shoes, and they're a large size or a size 11. The measurements fit exactly the heel print at the scene. Circumstantial evidence. Pretty good stuff, don't you think?

Even if, even if half of the shoes that [the shoe store] originally had were size 11, we're down to one in 15, [r]ight? Because there were 15 pairs of the same kind of shoe, so we're down to one in 15 pairs? Now you want to reduce that probability a little more? How about the defendant was wearing that pair of shoes on that night, and lo and behold, he had the contact with the victim. Where did he have the contact? [The bar where the victim and Miller met].

█ Since no objection was timely lodged to the prosecutor's closing argument, the plain error standard must be applied to alleged prosecutorial misconduct. W.R.A.P. 7.05. To invoke plain error, the record must clearly show that what occurred at trial violated a clear and unequivocal rule of law in such an obvious way as to have adversely affected some substantial right of the defendant. *McLaughlin v. State,* 780 P.2d 964, 971 (Wyo.1989) (quoting *Browder v. State,* 639 P.2d 889 (Wyo. 1982)). The trial record must be considered "as a whole and not as to whether any one single incident standing alone would be reversible." *McLaughlin,* 780 P.2d at 971. "[Counsel] is entitled to reflect upon the evidence and to draw reasonable inferences from that evidence in order to assist the jury in its function." *Jeschke v. State,* 642 P.2d 1298, 1301–02 (Wyo.1982).

█ Upon review of the entire trial record, it is apparent that the presence of the heel print and the subsequent testimony and argument were but a minuscule

part of the prosecution's entire case-in-chief. No objection was offered during the prosecutor's closing argument and Miller's brief fails to state what right was substantially affected. Since the purpose of closing argument is to explain the significance of evidence and how it should be viewed, counsel may comment upon the facts in evidence and draw reasonable inferences. *McLaughlin,* 780 P.2d at 970. This is exactly what happened. The prosecutor drew reasonable inferences from the testimony and presented them to the jury.

Miller relies upon *People v. Collins,* 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968) as precedent for his appeal on this issue. In *Collins* and other subsequent cases, the witness testifying was an expert, and the testimony elicited was a mathematical probability that the defendant did the crime. *See State v. Carlson,* 267 N.W.2d 170 (Minn.1978) and *State v. Sneed,* 76 N.M. 349, 414 P.2d 858 (1966). These cases are easily distinguished from this case. Here, the prosecutor was neither a witness nor giving testimony.

The evidence is overwhelming and, in the absence of objection by counsel, we cannot say there was any prejudicial denial of a fair trial. *Coleman v. State,* 741 P.2d 99 (Wyo.1987). The prosecutor was fairly commenting on the evidence. Our discussion of the plain error application to closing argument provided in *Armstrong v. State,* 826 P.2d 1106 (Wyo.1992) and *Herdt,* 816 P.2d 1299 is dispositive. *See also Dice v. State,* 825 P.2d 379, 385 (Wyo.1992), where we said:

> Plain error in closing argument must remain hard to find because otherwise the trial court becomes charged with an adversary responsibility to control argument even when objection is not taken by the opposing attorney.

This case provides no plain error in final argument.

### D. *Limiting Instruction*

■■■ Miller admitted during trial that he and his female friend agreed to fabricate

**9.** Jury Instruction No. 14 read:
    If you find that the Defendant attempted to fabricate evidence, then you may consider

an alibi for his whereabouts during the time of the rape: "[J]ust tell them that you gave me a ride home that night." Miller testified that the false alibi was his idea. The female friend provided the police with the false alibi, but recanted the following day.

Miller now claims that the trial court erred in failing to give a limiting instruction that the fabricated alibi could only be used as consciousness of guilt and not as evidence of guilt. However, the record shows that no jury instruction was offered by the defense as to the consciousness-versus-evidence of guilt distinction. Also, defense counsel failed to raise any objection as to the relevant jury instruction which was given.[9]

■■■ The fabrication of false accounts for the sake of diverting suspicion is a circumstance always indicative of guilt. *Bennett,* 377 P.2d at 638. We have held that "[s]ubsequent activity in order to prevent detection of a crime is relevant circumstantial evidence." *Hopkinson v. State,* 632 P.2d 79, 103 (Wyo.1981), *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). Flight is admissible as evidence of guilt, *Smizer v. State,* 752 P.2d 406 (Wyo.1988), and is admissible as tending to show consciousness of guilt. *Jones v. State,* 568 P.2d 837, 845 n. 10 (Wyo. 1977). We have followed the principle that evidence of an attempt to fabricate evidence is particularly harmful to a defendant since it is an incriminating circumstance inconsistent with innocence and tends to show consciousness of guilt. *State v. Bruner,* 78 Wyo. 111, 319 P.2d 863, 869 (1958). We have consistently used the terms "evidence of guilt" and "consciousness of guilt" interchangeably. *See Smizer,* 752 P.2d at 411; *Hopkinson,* 632 P.2d at 103; *Jones,* 568 P.2d at 845 n. 10; and *Bennett,* 377 P.2d at 638.

Miller admitted that he fabricated the alibi. The jury was free to determine the reason for the fabrication. Had Miller's

that fact in determining the question of his guilt or innocence.

defense counsel desired an instruction different from the one given, he should have requested one.

The trial judge did not err when he instructed the jury that a fabricated alibi could be considered as evidence of guilt.

### E. Ineffective Assistance of Counsel

■ Miller was expeditiously provided a most experienced public defender for his representation.[10] At his arraignment, Miller pled not guilty, not guilty by reason of mental deficiency, and not triable by reason of mental illness or deficiency. Defense counsel followed in careful preparation with motions to suppress identification, for independent examination, for extension of time to file liminal motions relating to W.R.E. 404(b) issues, to disclose evidence and reduce bond, for production of evidence and discovery, for witness listings, and order for defense subpoenas. Defense counsel also filed motions in limine to suppress evidence regarding a previous conviction for sexual assault and a fabricated alibi. Miller's counsel timely submitted proposed jury instructions. The record demonstrates an active oral defense, including examination and cross-examination of witnesses, consulting his client of his rights, and making the normal decisions regarding the presentation of evidence and testimony.

"An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). We have adopted the United States Supreme Court's test for determining whether a defendant was denied effective assistance of counsel. *See Herdt*, 816 P.2d 1299; *Cardenas v. State*, 811 P.2d 989 (Wyo.1991); and *Justice v. State*, 775 P.2d 1002 (Wyo.1989). In *Strickland*, 104 S.Ct. at 2066, the following test is set forth:

[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind * * * that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Miller's trial counsel was a seasoned criminal trial attorney. He represented Miller from the day after he was arrested until the pendency of this action. He filed the appropriate motions and represented Miller consistently and competently—more competent representation would be hard to find. Considering the weight of the evidence against his client as well as his client's propensity to confabulate and make incriminating statements, Miller's defense counsel presented an admirable defense. This record totally fails to provide any basis for Miller's ineffectiveness of counsel complaint.

■ We observe that Miller was well represented by expert counsel whose conduct was not deficient, *Barron v. State*, 819 P.2d 412 (Wyo.1991), and furthermore, if we needed to reach that subject, that no trial court error was created from which prejudice to the accused could be established. *Robinson v. State*, 716 P.2d 364 (Wyo.1986); *Spilman v. State*, 633 P.2d 183 (Wyo.1981). Lack of capacity to create miracles is not the test of ineffectiveness of criminal defense counsel. *Osborn v. State*, 806 P.2d 259, 270 (Wyo.1991).

### F. Cumulative Error

■ "A claim of cumulative error depends upon error being recognized." *Jus-*

---

10. With a prior rape and other felony convictions, two charged events separated by only two days and the positive identification by the physi-
cally injured victim, Miller's litigative status was not favorable.

*tice,* 775 P.2d at 1011. Because we have not found error in any of the issues asserted by Miller in his appeal, there cannot be cumulative error. *Dice,* 825 P.2d 379.

Affirmed.